# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| SUSAN L. GREIFZU-HAMRIC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:16-cv-0177-NCC |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner determining that plaintiff Susan Greifzu-Hamric ("Plaintiff") was no longer disabled, and therefore discontinuing her disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401, *et seq*. Plaintiff has filed a brief in support of the Complaint (Doc. No. 19), Defendant has filed a brief in support of the Answer (Doc. No. 26). The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c) (Doc. No. 13).

## I. PROCEDURAL HISTORY

On October 25, 2003, Plaintiff was found to be disabled due to ovarian remnant syndrome, with an initial onset date of August 1, 2001. (Tr. 226-229). This 2003 decision is the comparison point decision ("CPD") against which her continuing disability is measured. Plaintiff underwent a medical improvement review on November 18, 2011, and on April 2, 2012, a

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

disability examiner for the Social Security Administration filed an Explanation of Determination, stating that there had been significant medical improvement in Plaintiff's severe impairment and that she could perform work-related duties. (Tr. 223-225). As a result, Plaintiff was deemed "no longer disabled" as of April 1, 2012 and informed that her benefits would cease on June 30, 2012. (*Id.*). The determination was upheld by a state disability hearing officer on November 1, 2012. (Tr. 242-252). Plaintiff requested review by an Administrative Law Judge ("ALJ"), and a hearing was held on April 11, 2013. (Tr. 46-91). Supplemental hearings were held on March 24 and April 1, 2014. (Tr. 92-197, 198-222). Plaintiff attended and testified at each hearing. At the second hearing, rheumatologist Ann Winkler, M.D., clinical psychologist Richard Hutchison, Ph.D., and vocational expert Delores E. Gonzales testified. After the second hearing, the ALJ sent additional interrogatories to Dr. Winkler and received responses. (Tr. 788-790).

The ALJ issued her Decision in this matter on September 2, 2014. (Tr. 21-38). She found that Plaintiff ceased being disabled as of June 30, 2012 and was therefore no longer eligible for disability benefits. (Tr. 38). Plaintiff in turn filed a Request for Review of Hearing Decision/Order on November 7, 2014, putting the matter in front of the Appeals Council. (Tr. 8-10). On December 7, 2015, the Appeals Council denied Plaintiff's request for review (Tr. 1-7). As such, the ALJ's decision stands as the final decision of the Commissioner. This suit followed.

## II. BACKGROUND

Plaintiff is a 50 year-old woman, at the time of the hearings living with the youngest of her four children. (Tr. 55, 83). Prior to her initial disability, she worked in sales, most recently for Miller Brewing Company. (Tr. 144). That work involved riding along with distributers' employees on beer deliveries, setting up advertising displays, and occasionally helping to unload cases of beer. (Tr. 144). She attended college for two years. (Tr. 160).

Her primary complaints revolve around pain in her neck, her back, and abdomen. At various times she has also complained about generalized fibromyalgia, inability to hold or carry things, incontinence when she attempts to pick things up, radiant pain in her arm and leg, blurred vision, dizziness, cognitive impairments (notably poor memory) and muscle weakness.

On April 4, 2012, Plaintiff was involved in a motor vehicle accident. (Tr. 637). At the time, she denied having lost consciousness. (Tr. 639). She also reported no incontinence or motor weakness at follow-up appointments with her doctors 12 days, one month and three months after the accident. (Tr. 599, 602, 681-682).

Plaintiff testified that she had both "good days" and "bad days" as to her back, neck and abdomen, and that on a "bad day" her son helps her use the bathroom. (Tr. 55). Plaintiff testified that she is never without pain, and that on a ten-point pain scale, her lower back can get as low as a three, her stomach can get down to a 2.5, but that her neck "averages about an eight." (Tr. 67-68). In 2011, Plaintiff stated that she had chronic neck and back pain "for at least the last 20 years." (Tr. 571). She testified that she cannot carry a purse or wear a necklace due to pain. (Tr. 82-83). Plaintiff testified that her neck hurts 24 hours a day, 7 days a week, and pain shoots down her arm. (Tr. 208). Plaintiff claimed that she can only lift and carry about four pounds (the weight of the smallest of her three dogs) on a regular basis (Tr. 83), and that she drops things "all the time" when her hands "go numb." (*Id.*). She also claimed to suffer from fibromyalgia and have radiant, burning and throbbing pain in her spine. (Tr. 206-208). Plaintiff also claimed that she cannot bend, stoop or squat without pain (Tr. 215), that she had memory deficits (Tr. 214), and had intermittent blurred vision (Tr. 218). The ALJ also cited Plaintiff's testimony regarding her constipation and pain associated with both urination, which can make her need to lie down for half an hour afterward, (Tr. 219) and defecation, which at its worst

either makes her lie down for two hours (Tr. 63) or leaves her in "a ball for four hours" (Tr. 218-219).

In terms of treatment, Plaintiff testified that she takes opioid pain medication every day and has for an extended period of time, since at least 2001.  (Tr. 55, 62, 660). Plaintiff noted that ice "helps a lot" and that she uses a transcutaneous electrical nerve stimulation ("TENS") unit on her neck and back which "helps some." (Tr. 66-67). She also gets massages at the mall. (Tr. 67). Plaintiff testified that she suffers from side effects from her pain medications, notably constipation and dizziness.  (Tr. 62).

### III. LEGAL STANDARD

Under 42 U.S.C. § 405(g) and Eighth Circuit case law, this Court reviews the final decision of the Commissioner to determine whether that decision is supported by substantial evidence on the record as a whole. *See Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994). Substantial evidence, in turn, is "less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart,* 294 F.3d 1019, 1022 (8th Cir. 2002). Thus, the decision of the Commissioner may not be reversed solely because this Court might have decided the case differently. *Id.* at 1022. Instead, this Court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the Commissioner's conclusion. *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001).

Additionally, this Court will determine whether the Commissioner correctly applied the eight step process described at 20 C.F.R. § 404.1594 for determining whether Plaintiff continues to be disabled.

At step one of this process, the Commissioner must determine if the Plaintiff is engaging in substantial gainful activity ("SGA"). If the Plaintiff is performing substantial gainful activity, the Plaintiff is no longer disabled. 20 C.F.R. § 404.1594(f)(1).

At step two, the Commissioner must determine whether the Plaintiff has an impairment or combination of impairments which meets or medically equals the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).[2] If the Plaintiff has such impairments, her disability continues. 20 C.F.R. § 404.1594(f)(2).

At step three, the Commissioner must determine whether medical improvement has occurred. 20 C.F.R. § 404.1594(f)(3). Medical improvement is any decrease in medical severity of the impairment(s) as established by improvement in symptoms, signs and/or laboratory findings. 20 C.F.R. § 404.1594(b)(1). If medical improvement has occurred, the analysis proceeds to the fourth step. If not, the analysis proceeds to the fifth step.

At step four, the Commissioner must determine whether medical improvement is related to the ability to work. 20 C.F.R. § 404.1594(f)(4). Medical improvement is related to the ability to work if it results in an increase in the Plaintiff's capacity to perform basic work activities. 20 C.F.R. § 404.1594(b)(3). If medical improvement is not related to the Plaintiff's ability to work, the analysis proceeds to step five; if medical improvement is related to the Plaintiff's ability to do work, the analysis moves to step six.

_____

[2] "[T]he listings were designed to operate as a presumption of disability that makes further inquiry unnecessary….That is, if an adult is not actually working and his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and he is awarded benefits without a determination whether he actually can perform his own prior work or other work." *Lott v. Colvin*, 772 F.3d 546, 549 (8th Cir. 2014) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990)).

If the Commissioner found at step three that there was no medical improvement, or found at step four that the medical improvement is not related to the ability to work, then at step five, the Commissioner considers whether any of the exceptions at 20 C.F.R. § 404.1594(d) and (e) apply. If none of them apply, the Plaintiff's disability will be found to continue. If one of the first group of exceptions to medical improvement applies, the analysis proceeds to step six; if an exception from the second group of exceptions to medical improvement applies, the disability will be found to have ended.

At step six, the Commissioner must determine whether the Plaintiff's current impairments when considered in combination are "severe," in that they significantly limit the Plaintiff's ability to do basic work activities. 20 C.F.R. § 404.1594(f)(6). If all current impairments in combination do not significantly limit the Plaintiff's ability to do basic work activities, the Plaintiff is no longer disabled. If they do, the analysis proceeds to the next step.

At step seven, the Commissioner must assess the Plaintiff's residual functional capacity ("RFC") based on the current impairments and determine if she can perform past relevant work. 20 C.F.R. § 404.1594(f)(7). If the Plaintiff has the capacity to perform past relevant work, her disability has ended. If not, the analysis proceeds to the last step.

At the final step, the Commissioner must determine whether other work exists that the Plaintiff can perform, given her residual functional capacity and considering her age, education, and past work experience. 20 C.F.R. § 404.1594(f)(8). If the Plaintiff can perform other work, she is no longer disabled. If the Plaintiff cannot perform other work, her disability continues.

It is not the job of the district court to re-weigh the evidence or review the factual record *de novo*. *Cox*, 495 F.3d at 617. Weighing the evidence is a function of the ALJ, who is the fact-finder. *Masterson v. Barnhart*, 363 F.3d 731, 736 (8th Cir. 2004). An administrative decision

which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. *Krogmeier*, 294 F.3d at 1022.

To determine whether the Commissioner's final decision is supported by substantial evidence, the court is required to review the administrative record as a whole and to consider:

(1) Findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

*Brand v. Sec'y of Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

## IV. DECISION OF THE ALJ

The ALJ found that at the time of the CPD, Plaintiff had the medically-determinable impairment of ovarian remnant syndrome, which limited her residual function to lifting and carrying less than 10 pounds, stand  or walk less than two hours per eight-hour work day, and sit less than six hours during an eight-hour work day. (Tr. 23). The ALJ determined that Plaintiff had not engaged in SGA through the termination date of her disability benefits. (*Id.*).

The ALJ also found that Plaintiff does not suffer from an impairment or combination of impairments of a severity that meets or medically equals the required severity of a listing. (*Id.*). The ALJ evaluated Plaintiff's medically-determinable physical impairments against Listings 1.04

(spinal disorders), 14.06 (undifferentiated and mixed connective tissue disease) and 14.09

(inflammatory arthritis) and found that they did not meet the criteria. (Tr. 24).

The ALJ also evaluated Plaintiff's mental impairments against the requirements of

Listings 12.04 (depressive, bipolar and related disorders) and 12.06 (anxiety and obsessive-

compulsive disorders). (*Id.*). She determined that Plaintiff's condition did not satisfy the

requirements of "paragraph B" for either listing, which requires that a claimant have two of the

following attributable to the mental impairment(s): marked restriction of activities of daily

living; marked difficulties in maintaining social functioning; marked difficulties in maintaining

concentration, pace or persistence; and repeated episodes of decompensation, each of an

extended duration. (*Id.*). Specifically, the ALJ found that she was only mildly restricted in

activities of daily living, had only mild difficulties with social function, and experienced

moderate difficulties with concentration, pace and persistence. (Tr. 24-25). She also determined

that Plaintiff had not had any episodes of decompensation that had extended duration. (Tr. 25).

Further, the ALJ determined that Plaintiff did not meet the "paragraph C" requirements of

Listing 12.04. (Tr. 25).

In her Decision, the ALJ determined that Plaintiff's issues related to the ovarian remnant

syndrome had improved from the CPD to the June 30, 2012 cessation of benefits. (Tr. 26). The

ALJ based this finding largely on the fact that there has been no treatment specifically related to

the condition for a significant period of time, and that her then-current RFC showed greater

functionality than at the CPD. (Tr. 26). The ALJ found that this improvement had bearing on

Plaintiff's ability to work. (*Id.*).

The ALJ determined that, as of the termination of her benefits, Plaintiff had medically-

determinable impairments of ovarian remnant syndrome, cervical degenerative disc disease and

radiculopathy, mild osteoarthritis, mild sensory loss, obesity, adjustment disorder with a depressed mood, depressive disorder not otherwise specified, generalized anxiety disorder, opioid dependence and depression. (Tr. 26). Although she did not use the word "severe" in her characterization, it is clear that the ALJ made the finding that these were Plaintiff's severe impairments, as she contrasts them with the "nonsevere" impairments of fibromyalgia and chronic pain syndrome.[3] (Tr. 26-27). The ALJ made these nonsevere findings on the basis that although the diagnosis was included in several of Plaintiff's medical records, she had never been treated specifically for those conditions. (Tr. 27). She relied significantly on Dr. Winkler's testimony in coming to this conclusion. (*Id.*).

The ALJ determined that Plaintiff had an RFC as of June 30, 2012 that allowed her to lift and carry up to 10 pounds frequently, and sit, stand or walk sit hours out of an eight-hour workday. (Tr. 27). The ALJ determined that Plaintiff could also occasionally use either hand for overhead reaching, and frequently use either foot to operate foot controls. (*Id.*). The ALJ found that Plaintiff's conditions required that she should never climb ladders or scaffolds or work at unprotected heights, but is able to occasionally do work involving moving mechanical parts or climb stairs or ramps. (*Id.*). Plaintiff was also found to be able to occasionally stoop, kneel, crouch and crawl. (*Id.*). The ALJ determined that Plaintiff was limited to work that requires mostly simple tasks, although she is able to perform some complex tasks. (*Id.*).

The ALJ stated that Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but that her statements concerning the

---

[3] This is one of a few minor errors in the Decision, another being a misspelling of the name of Plaintiff's treating physician. These are *de minimis* issues which do not impact the substance of the Decision. "[A]n arguable deficiency in opinion writing that had no practical effect on the decision ... is not a sufficient reason to set aside the ALJ's decision." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016).

intensity, persistence and limiting effects of such symptoms "are of only a limited credibility" and that they are supported to the extent reflected in the RFC. (Tr. 36). The specifics of the credibility findings are discussed in greater detail below.

The ALJ found that Plaintiff was unable to perform past relevant work, but that other jobs existed in significant numbers in the national economy that were compatible with Plaintiff's determined RFC. (Tr. 36). Specifically, based on the testimony from vocational expert Delores Gonzales, the ALJ found that someone with Plaintiff's age, education, experience and RFC could perform as an appointment clerk (121,745 jobs nationally), an information clerk (97,304 jobs nationally), a call-out operator (8,316 jobs nationally), an addresser (8,904 jobs nationally) and a surveillance system monitor (17,735 jobs nationally). (Tr. 37).

As a result of the eight-step inquiry, the ALJ found that Plaintiff no longer qualified as disabled as of June 30, 2012, and therefore the termination of her disability benefits was proper. (Tr. 38).

## V. DISCUSSION

Plaintiff attacks the adequacy of the ALJ's Decision, as adopted by the Commissioner, on three primary bases. First, she alleges that the ALJ "failed to accord sufficient weight to treating expert opinions" and improperly excluded limitations for "sitting, standing, walking, laying down, being off task due to mental issues and pain, and absences[.]" (Doc. No. 19 at 12-13). Second, Plaintiff argues that the ALJ's reliance on the vocational expert's testimony regarding availability of work was improper. *Id.* at 20. Finally, she asserts that the ALJ's credibility determination was improper as the latter failed to make "sufficiently specific findings regarding certain testimony." *Id.* at 21.

### a. Credibility

The Court will first consider the ALJ's credibility analysis and determination, as the evaluation of Plaintiff's credibility was essential to the ALJ's determination of other issues, including Plaintiff's RFC. "Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001). *See also Wildman v. Astrue*, 596 F.3d 959, 969 (8th Cir. 2010) ("[Plaintiff] fails to recognize that the ALJ's determination regarding her RFC was influenced by his determination that her allegations were not credible.") (*citing Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005)); 20 C.F.R. §§ 404.1545, 416.945 (2010). In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008); *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984). ALJs need not explicitly discuss each *Polaski* factor. *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (citing *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003). *See also Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010); *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006). The Court finds that the reasons offered by the ALJ in support of her credibility determination are based on substantial evidence.

Plaintiff asserts that the ALJ's statement that she found Plaintiff's testimony regarding the severity of her impairments and the resultant limitations to have "limited credibility" is conclusory and insufficient to satisfy the standard for explaining such a determination. Were the final paragraph of that section the only statement on Plaintiff's credibility, this would be correct. However, the ALJ explicitly states a number of bases for doubting Plaintiff's subjective statements as explanation as to how she arrived at her RFC conclusion.

The ALJ set forth a number of Plaintiff's statements regarding her subjective symptoms and limitations gleaned from her testimony outlined above. The ALJ then summarized Plaintiff's extensive medical records and noted the contradictions with the self-reported issues. In doing so, the ALJ both explicitly and implicitly indicates what allegations she deemed incredible.

Plaintiff underwent an MRI of her lumbar spine on April 13, 2011, which revealed a right paracentral prominent disc herniation in the L5-S1 space producing severe stenosis of the right lateral recess and displacement of the traversing right S1 nerve. (Tr. 553). On September 13, 2011, she had a cervical MRI, which showed a broad-based disc/spur at the C6-C7 level causing bilateral foraminal encroachment, but no central canal stenosis or cord impingement. (Tr. 552).

Plaintiff's medical records show that she denied neurological deficits, numbness or tingling when seeing pain specialist Dr. Mahendra Gunapooti, M.D., in November 2011, and demonstrated motor strength in both her arms and legs of four-plus out of five. (Tr. 554-555).

Similarly, Plaintiff's records from the St. Louis University Hospital emergency room when she was involved in the motor vehicle accident show full extremity strength. (Tr. 644). Plaintiff underwent several CT scans during treatment. The CT scan of her cervical spine revealed normal vertebral body heights, disc interspaces and bony alignment. (Tr. 650). It also showed no fracture or subluxation (dislocation) anywhere in the cervical spine, and normal

paravertebral soft tissues. (*Id.*). And a CT of the lumbar spine revealed no fracture, no subluxation, and only a mild diffuse disc bulge at the L5-S1 level, indicating mild degenerative disc disease at that level. (Tr. 652). Finally, a CT scan of her thoracic spine revealed no abnormalities with that area. (Tr. 655).

On April 16, 2012, twelve days after the accident, Plaintiff displayed a normal cervical and lumbar range of motion in both flexion and extension. (Tr. 599-600). She denied any neurological deficits at all, including incontinence or motor weakness. (Tr. 599). She also demonstrated the same four-plus out of five motor strength that she had prior to the accident, displayed "good hand grip" and denied any numbness or tingling. (Tr. 599-600).

Two days later, Plaintiff went back to St. Louis University Hospital, complaining of "headache, memory loss, major pain, difficulty talking, numbness, sharp pain, feeling like fire in the legs, visual changes, backache, joint pain, joint swelling and dis[c] problems in addition to depression, anxiety, thyroid problems, night sweats and incontinence." (Tr. 660-661). This stands in stark contrast to her report of two days prior with Dr. Gunapooti (Tr. 599-600). The physician's own observation showed that Plaintiff had full motor strength in both her arms and legs, normal sensation—the only limitations appeared to be in subjective aspects, such as tenderness and how far she could flex. (Tr. 661). Plaintiff was referred to physical therapy and to follow up with her pain management physician. (*Id.*). This conservative treatment decision appears to be at odds with the severity of the symptoms claimed by Plaintiff.

When Plaintiff followed up with Dr. Gunapooti on May 7, 2012, she again denied any neurological deficits, specifically including incontinence, tingling or numbness. (Tr. 602). Despite complaining of moderate to severe chronic back pain, she was out of the cervical collar she had worn since the accident and displayed a normal range of motion in her cervical and

lumbar extension and flexion. (Tr. 602-603). She had no sensory issues, and displayed her normal four-plus out of five extremity strength and good hand grip. (Tr. 603). Dr. Gunapooti also added a diagnosis of "Drug dependence Opioid-unspecified." (Tr. 602).

On June 11, 2012, Plaintiff underwent another series of MRIs on her cervical and lumbar spine. The cervical scan revealed no fracture, spondylolisthesis or loss of vertebral height. (Tr. 683). It was largely unremarkable save for a diffuse annular disc bulge and disc desiccation at the C6-C7 level and mild joint spurring contributing to mild neuroforaminal exit stenosis. (Tr. 683-684). The radiologist notes that there was no significant change from the previous exam. (Tr. 684). The lumbar scan showed a mild disc bulge and neuroforaminal encroachment at L4-L5, and a broad-based disc bulge and facet arthropathy at L5-S1. (Tr. 685). The radiologist compared this scan to the April 2011 scan referenced above, stating that "if anything, the right paracentral protrusion at L5-S1 is less pronounced compared to the prior examination[.]" (*Id.*). When asked about this apparent improvement, Plaintiff attributed it to "[t]he healing from God[,]" but gave no other response when the ALJ asked her to account for the contrast between this objective improvement and the worsening of her self-reported complaints. (Tr. 86-87).

Subsequent to these tests, Plaintiff saw Dr. Gunapooti every two to three months for follow-up and medication refills until March 2013. (673-682). At no point in her medical records does Plaintiff complain of any neurological deficits or muscle weakness, nor was she observed to have anything less than four out of five extremity strength and a full range of motion.

On November 6, 2012, Plaintiff was admitted to SSM St. Joseph Health Center due to suicidal comments made to her daughter and police. (Tr. 628). The records indicate that she was upset about her financial situation (including the disability determination), angry at her daughter, and angry that she had spent $1,500 to repair her son's car (which subsequently caught fire). (*Id.*)

William Wang, M.D., Ph.D., saw her and recorded that she had a history of depression from 2007, but that she did not have suicidal thoughts or symptoms. (Tr. 628-629). He also noted that her mood and affect were "appropriate" once she was admitted (anxious and depressed), that she had no memory impairment or other cognitive deficit, and that her cognition, insight and judgment were all fair. (Tr. 628, 630-631). She was discharged the following day after the staff determined that it was safe to do so. (Tr. 631).[4]

Plaintiff underwent a neuropsychological examination by Tyler Roskos, Ph.D., on September 30, 2013. (Tr. 807-811). In that evaluation, Plaintiff stated that she was having difficulty adding simple numbers and had "ongoing memory difficulties." (Tr. 807-808). Dr. Roskos observed that her gait and balance to be generally unremarkable, but she did have discomfort in her right arm. (Tr. 808). He also found that her recent and remote memory were intact, her affect was appropriate and that she was "friendly and cooperative[.]" (*Id.*) After performing a variety of tests, Dr. Roskos found that her IQ was within normal limits (estimated 92), that she had average attention and processing speeds, and that her memory in both immediate and remote recall were average or low-average. (Tr. 809). He did find that her fine motor speed and dexterity were mildly impaired with both hands, and that her copying of a complex geometric figure was below expectation. (*Id.*). Dr. Roskos concluded that the results were "not suggestive" of traumatic brain injury. (Tr. 810).

---

[4] Plaintiff makes reference to her Global Assessment of Functioning ("GAF") scores at both admission and discharge. GAF scores, particularly low scores, have long been disfavored in disability cases, as the scale "does not have a direct correlation to the severity requirements in our mental disorder listings." 65 Fed.Reg. 50746, 50764–65, 2000 WL 1173632 (August 21, 2000).

The ALJ cited Plaintiff's October 2013 office visit with her primary care physician, Dr. Jill Bosanquet,[5] where she complained of feeling like "she drags right leg when walking" and having arm pain while holding a soda, but during the objective examination showed normal muscle tone and muscle strength of five out of five. (Tr. 890-891).

Plaintiff also had a nerve conduction study on December 9, 2013. (Tr. 926). That test indicated she had minimal denervation changes in her right triceps, possibly indicating C6 radiculopathy. However, the lack of other signs of entrapment neuropathy, normal compound muscle action potential and sensory nerve action potential values made the neurologist, Glenn Sherrod, D.O., suggest that further clinical correlation and evaluation were needed. (Tr. 927).

Plaintiff was also seen by pain management specialist Sean Stoneking, M.D., at SSM St. Joseph Hospital West. On January 8, 2014, Plaintiff complained of neck pain, lower back pain, abdominal pain, right arm weakness, diarrhea and constipation. (Tr. 964). She denied any bowel or bladder issues as well as blurred vision and any neurological issues other than headaches. (Tr. 964, 967). Dr. Stoneking noted slightly decreased grip strength and extension/flexion strength in the right arm, with decreased reflex in her right upper arm and diminished sensation in her right leg. (Tr. 968). He also found that Plaintiff's back extension, flexion, side bend and rotation were "moderately" reduced. (*Id.*).

The ALJ also cited records from neurologist Dr. Umar Daud, M.D., from January 13, 2014, which show that despite complaining of muscle weakness, muscle tenderness, confusion and joint pain, Plaintiff exhibited minimal tenderness in her back and neck, a normal range of

---

[5] Both the ALJ and the transcript Table of Contents incorrectly list these records as belonging to "Sarah Nicolay, M.D.," rather than Dr. Bosanquet. Ms. Nicolay appears to be a Medical Assistant (MA) in that office, and signed these reports in that capacity alongside Dr. Bosanquet.

motion in her neck and other joints, no joint swelling, normal muscle strength, and a negative straight-leg-raise test. (Tr. 948-949).

In examining the record as a whole, there is substantial evidence to support the ALJ's conclusion that Plaintiff suffered from some restrictions due to her neck and back conditions, but not to the extent claimed by Plaintiff. Plaintiff exhibited mild restrictions on her range of motion, extremity strength and ability to grip fairly consistently before and after the date her disability was deemed to have terminated, casting significant doubt on the veracity of her claims not to be able to sit, stand, bend, lift minimal weight or wear even a necklace around her neck.

An ALJ is entitled to consider a lack of objective findings to support Plaintiff's allegations about her physical impairments in determining the credibility of such allegations. *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004). Plaintiff is correct in citing to *Lowe v. Apfel,* 226 F.3d 969, 972 (8th Cir. 2000) for the proposition that an ALJ may not discount the credibility of a claim solely because it is not fully supported by medical evidence. However, she omits an important half of the sentence: "[t]he ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, *but the complaints may be discounted based on inconsistencies in the record as a whole*." *Id.* (emphasis added). An ALJ is "entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002) (*citing* 20 C.F.R. §§ 404.1529(c) & 416.929(c)). Here, the ALJ did not discount some of Plaintiff's subjective allegations because they were not substantiated by objective medical evidence, but because many were actively contradicted by medical testing and observation by medical professionals.

In total, the ALJ provided numerous examples and citations of instances where Plaintiff's statements, either in testimony or statements to physicians, about her subjective complaints were contradicted by other evidence in the record. While the ALJ only summarized her findings on the issue of credibility at the end of her discussion about formulating the RFC, the issue was addressed. As such, the ALJ provided sufficient explanation for her credibility determination, which was supported by substantial evidence.

### b. The RFC

A disability claimant's RFC is the most he or she can do despite his or her limitations. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" *McCoy v. Astrue*, 648 F.3d 605, 617 (8th Cir. 2011) (*quoting Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007)). An ALJ bears "the primary responsibility for determining a claimant's RFC" and may take into account a range of evidence, from personal observation to the claimant's statements regarding his or her daily activities, but "because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010). Further, an RFC determination "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Gordon v. Astrue*, 801 F. Supp. 2d 846, 861 (E.D. Mo. 2011)(quotation omitted). This is not to say that each statement of a component of the RFC must be followed by a specific recitation of which records support that finding.

Plaintiff's first attack on the RFC is that it is not supported by substantial evidence. As noted above, however, a showing that parts of the record are consistent with Plaintiff's position does not invalidate the ALJ's determination. An administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion. *Krogmeier*, 294 F.3d at 1022. With regard to Plaintiff's spinal impairments, the ALJ cited each of the imaging studies and acknowledged that they demonstrated a level of impairment in the spine generally characterized as either mild or moderate. (Tr. 28-30). It was therefore reasonable for the ALJ to conclude that any appropriate job would have to have some limitation on bending, stooping, crouching and crawling, the amount of weight she could lift, as well as something less than eight full hours of sitting, standing or walking.

The ALJ also noted the indications of osteoarthritis and the nerve conduction study's impression of mild denervation in Plaintiff's arm. (Tr. 31). As these and her cervical issues would rationally be thought to impede her ability to reach overhead and climb ladders or scaffolds, the ALJ placed a limitation on the RFC in accordance with how much a given activity would implicate those impairments.

The ALJ also considered pain and mental impairments as influencing Plaintiff's non-exertional limitations. As noted above, the ALJ evaluated her peripheral neurological issues with her physical impairments. The ALJ also discussed her mood disorder issues, noting that Plaintiff was not seeing any mental health professionals on an ongoing basis, but was being treated medically by her primary care physician and pain specialists. (Tr. 34). The ALJ also gave significant consideration to the neuropsychological examination of Plaintiff by Dr. Roskos and the opinion of clinical psychologist Richard Hutchinson, a non-examining consulting expert. (Tr.

34-35). Both reports note similar mild or moderate issues with concentration. As a result, the ALJ appropriately imposed an RFC limitation of mostly-simple work with some complex work, congruent with the evaluations showing some concentration, persistence or pace concerns and a low-end-of-average intelligence. The Eighth Circuit has held that RFC findings similar to the RFC in this case adequately captured the claimant's deficiency in memory, concentration, persistence, or pace. *See Brachtel v. Apfel*, 132 F.3d 417 (8th Cir. 1997), and *Martise v. Astrue,* 641 F.3d 909, 926 (8th Cir. 2011).

Plaintiff asserts that the ALJ erred in not adding additional limitations "such as those involving sitting, standing walking, lying down, work absences and being off task due to crying spells, pain or other issues." (Doc. No. 19 at 19). The ALJ did assign limitations to Plaintiff's ability to sit, stand and walk during a workday. (Tr. 27). The ALJ also evaluated Plaintiff's assertions about her mental impairments, and addressed those that she deemed credible by imposing limitations on the complexity of the work. (*Id.*). There was substantial evidence, both in the record (discussed above) and the expert opinions (discussed below) to support the ALJ's determination of how her impairments translated into functional limitations.

Plaintiff also disputes the weight the ALJ attributed to the various medical opinions in the case. The ALJ considered reports from state medical consultants Despine Coulis, M.D., and Donna McCall, D.O., rheumatologist Dr. Winkler, consulting expert Austin Montgomery, M.D., clinical psychologist Dr. Hutchinson, and primary care physician Dr. Bosanquet. Plaintiff's brief cites two sources as "medical opinion evidence" that the ALJ erred in failing to follow: Dr. Bosanquet's opinion and a "chiropractic source statement" from Daniel Coogan. (Doc. No. 19 at 16-17). Chiropractors are not an "acceptable medical source" in the regulatory scheme where

"only acceptable medical sources can provide medical opinions[.]" *Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007) (citing 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)).

      1.  Dr. Bosanquet

Dr. Bosanquet was Plaintiff's treating physician at the time of the Decision, and filled out a "Medical Statement Concerning Chronic Pain Syndrom[e] for Social Security Disability Claim" and a "Medical Statement Regarding Fibromyalgia for Social Security Disability Claim." (Tr. 867 and 869). Both are dated February 27, 2014.

In the first statement, Dr. Bosanquet did not choose an answer for "Is the patient suffering from a chronic pain syndrome?" but did assert that she had sleep disturbance, crying spells, decreased energy and difficulty concentrating or thinking. (Tr. 867).  She also attempted to assess Plaintiff's psychological issues, opining that Plaintiff did not have marked restriction of activities or social function. (*Id.*). On the preprinted question of whether Plaintiff had "[d]efficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere) due to pain[,]" Bosanquet marked "present". (*Id.*). Dr. Bosanquet did not elaborate on her findings, other than to say "[Plaintiff] endorses concentration and memory difficulties. Does have assistance from son for finances." (*Id.*).

In the second statement, Dr. Bosanquet checked boxes for "history of widespread pain for three or more months," "pain in 11 or more pressure points," "paresthesias," "sleep disturbance," "chronic fatigue," and "memory loss." (Tr. 869). She circled answers suggesting that Plaintiff was limited to working four hours per day in total, standing in place for 15 minutes at a stretch and no more than 60 minutes in a workday, 30 minutes of sitting at a time and 4 hours sitting total. (*Id.*). Dr. Bosanquet also stated that Plaintiff could lift no more than 10 pounds

occasionally, and raise each arm above shoulder level occasionally. (*Id.*). She also stated that Plaintiff is only able to stoop or bend occasionally. (*Id.*). The only elaboration was to say that a rheumatology evaluation had been done in December of 2013 where she had been diagnosed with fibromyalgia. (Tr. 870).

"Generally, [a] treating physician's opinion is due controlling weight if that opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (citation omitted). Conversely, a treating physician's opinion "does not automatically control in the face of other credible evidence on the record that detracts from that opinion." *Brown v. Astrue*, 611 F.3d 941, 951 (8th Cir. 2010) (citation omitted). "An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005).

Here, the ALJ stated that she gave little weight to either of Dr. Bosanquet's opinion statements and gave specific reasons for doing so. With regard to the Chronic Pain statement, the ALJ noted that Dr. Bosanquet is not a mental health professional, and did not cite to any medical records of her own or any other physician to support her conclusion. (Tr. 35). The narrative statement by Dr. Bosanquet is telling, in that it reads that Plaintiff "*endorses* concentration and memory difficulties" rather than saying that she actually *observed* Plaintiff displaying such deficits. Given the lack of reference to any source for her evaluation, the ALJ concluded that it appeared that Dr. Bosanquet "simply accepted [Plaintiff's] unsubstantiated subjective allegations of these symptoms in completing this opinion." (*Id.*). An ALJ may properly discount a treating

physician opinion insofar as it relied on Plaintiff's subjective complaints. *See Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) ("The ALJ was entitled to give less weight to [the physician]'s opinion, because it was based largely on [claimant]'s subjective complaints rather than on objective medical evidence.").

Similarly, the ALJ properly chose to give little weight to Dr. Bosanquet's opinion on Plaintiff's physical limitations. Again, the ALJ notes that the opinion contains scant reference to any records. (Tr. 33). The "December 2013" exam Dr. Bosanquet references appears to refer to a visit to Dr. Daud, who made no reference to any functional limitations other than that Plaintiff's range of motion (including her neck) was normal, as was her muscle strength with no tenderness and a negative straight-leg-raising test. (Tr. 957). The ALJ also notes that her findings are contradicted by significant portions of the records as a whole, particularly as to Plaintiff's extremity strength and range of motion. (Tr. 33). The ALJ again surmised that Dr. Bosanquet filled out these forms based upon uncritical acceptance of Plaintiff's own statements about her limitations. *Id.* There was substantial evidence to support the ALJ's interpretation, and thus she was within her discretion in choosing to accord these opinions little weight.

2. Other Opinions

Plaintiff does not explicitly challenge the ALJ's decisions on how much weight she accorded the remaining opinions. There is substantial evidence to support these determinations.

The ALJ accorded great weight to the physical limitation opinions of Dr. Coulis, Dr. McCall and Dr. Winkler, who were non-examining consultative experts. Dr. Coulis examined Plaintiff's medical records and submissions as a medical consultant at the disability review phase and offered her opinion on March 30, 2012. (Tr. 591-596). She determined that the records indicated that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, could stand

or walk for six hours per workday, sit for six hours per workday, and was limited to occasional climbing, balancing, stooping, kneeling, crouching or crawling due to her degenerative disc disease. (Tr. 592-593). She also found that Plaintiff should avoid concentrated exposure to hazards such as heights or machinery. (Tr. 594-595). Dr. McCall found essentially the same limitations in her July 17, 2012 report, although she substituted vibration for hazards. (Tr. 608-613). The ALJ endorsed these opinions because they were consistent with the evidence in the record of her condition at the date of termination of her disability. (Tr. 31-32).

The ALJ also afforded significant weight to Dr. Winkler's opinions on Plaintiff's ability to perform work-related actions. (Tr. 32). First, Dr. Winkler issued a written opinion on May 8, 2013). At that point, she determined that Plaintiff could lift and carry 10 pounds frequently and up to 20 pounds occasionally, sit for eight hours in a workday and stand or walk three hours during a workday. (Tr. 782-783). She found that Plaintiff could occasionally reach overhead with either hand and frequently use her feet to operate pedal controls. (Tr. 784). Dr. Winkler also imposed postural limitations of occasional stooping, kneeling, crouching, crawling and stair/ramp climbing. (Tr. 785). She did state that Plaintiff could not perform a job that required her to climb ladders or scaffolds, or work at unprotected heights. (Tr. 785-786). Dr. Winkler also limited her to occasional exposure to moving mechanical parts. (Tr. 786). Dr. Winkler examined additional documents, responded to interrogatories (Tr. 788-790) and testified at the first supplemental hearing on March 24, 2014. (Tr. 105-136). With regard to the RFC, Dr. Winkler noted the nerve conduction testing results and stated that Plaintiff would be slightly more limited in what she was able to do with her right arm after that finding, which she opined would change Plaintiff's lifting and carrying capacity to no more than 10 pounds occasionally all other manual dexterity tasks (reaching other than above her shoulder, handling, fingering and feeling) would

be limited to 'frequent' and pushing or pulling would match the above-the-shoulder 'occasional' reaching restriction. (Tr. 113-115). Again, the ALJ accorded weight to these opinions because the first was generally consistent with Plaintiff's records up to December 2013, and the latter addressed additional limitations arising after the date of termination. (Tr. 32-33).

The ALJ accorded some weight to the opinion issued by consultative examiner Dr. Montgomery on July 26, 2013. (Tr. 792-795 and 802-805). Although he did not offer specific functional limitations, Dr. Montgomery did observe that Plaintiff "wince[d] with apparent pain from time to time[,]" and that her right leg and right arm were somewhat weaker than the left. (Tr, 794-795). He also noted that Plaintiff "alleges pain" on her straight-leg-raising test, back flexion/extension and forward leg flexion. (Tr. 805).

Finally, the ALJ accorded great weight on Dr. Hutchinson's opinion of Plaintiff's mental impairments. (Tr. 35). In addition to testifying regarding whether Plaintiff met the criteria for the listings described above, Dr. Hutchinson testified that Plaintiff's records showed a generally mild depressed mood and mild restrictions in her daily activities, but displayed at most moderate difficulties in concentration, pace and persistence in her neuropsychological evaluation. (Tr. 143). As a result, he testified that a job consisting of mostly simple tasks with some complex tasks would be appropriate for Plaintiff. (Tr. 145). The ALJ accorded Dr. Hutchinson's opinion great weight, as it was consistent with the objective portions of the record. (Tr. 35).

c. **The Vocational Expert**

Finally, Plaintiff raises an issue with regard to the ALJ's use of the vocational expert's testimony. Plaintiff recites the requirement that evidence from a vocational expert about the jobs someone with claimant's RFC could perform must be consistent with the description of the job in the Dictionary of Occupational Titles ("DOT"). (Doc. No. 19 at 20). That is to say, if a

vocational expert testifies that a hypothetical individual could perform Job X and there are 30,000 of those positions, the DOT's listing of the requirements for Job X cannot include something excluded by the RFC. Plaintiff cites *Kemp ex rel. Kemp v. Colvin*, 743 F.3d 630, 632-633 (8th Cir. 2014), a case in which the vocational expert's testimony that a claimant could work as a check weigher despite the fact that the claimant had a limitation on reaching and the definition of check weigher suggested the job required constant reaching.

Plaintiff does not, however, specify any such conflicts between Plaintiff's RFC and the requirements of the jobs named by Ms. Gonzales. The ALJ specifically asked whether the vocational expert's answers to her hypotheticals were consistent with the DOT, and to identify any areas in which they varied from the DOT. Ms. Gonzales answered that the only variance was that the DOT listings do not comment on either absence rate or time off task, questions about which were answered from her direct experience. (Tr. 174).

To the extent there might be some inconsistencies on some positions, there were still sufficient jobs in the national economy to support the ALJ's findings. As Defendant points out in her brief, the Eighth Circuit specifically upheld an ALJ's determination that Surveillance System Monitor and Call Out Operator were appropriate jobs for a person with similar limitations (no overhead reaching). *Welsh v. Colvin*, 765 F.3d 926, 930 (8th Cir. 2014). The ALJ properly relied upon the vocational expert's testimony regarding the number of available jobs someone with Plaintiff's RFC could perform.

## VI. CONCLUSION

For the reasons set forth above, the Court finds that substantial evidence on the record as a whole supports the Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**, and Plaintiff's Complaint is **DISMISSED with prejudice**.

A separate judgment in accordance with this Memorandum and Order is entered this same date.

Dated this 29th day of March, 2017.

                               /s/ Noelle C. Collins
                             NOELLE C. COLLINS
                             UNITED STATES MAGISTRATE JUDGE